UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CIVIL ACTION NO. 16-78-DLB-CJS

PAUL TARTER                                                                                           PLAINTIFF

v.                          **MEMORANDUM ORDER AND OPINION**

AP/AIM RIVERCENTER SUITES, LLC, et al.                              DEFENDANTS

\* \* \* \* \* \* \* \* \* \*

This case is before the Court on Defendant AP/AIM Rivercenter Suites, LLC's ("AP/AIM") Motion for Summary Judgment (Doc. # 68) in this personal-injury action brought by Plaintiff against AP/AIM and Ecolab, Inc. For the reasons stated below, AP/AIM's Motion for Summary Judgment is **denied**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Paul Tartar filed this action on May 10, 2016, alleging that Defendant AP/AIM had breached its duty of care owed to him while he was on premises owned by AP/AIM. (Doc. # 1). Following briefing by the parties on Defendant's Motion for Summary Judgment (Docs. # 18, 27, 32), and with the permission of the Court (Doc. # 38), Plaintiff filed an Amended Complaint, adding Ecolab as a Defendant. (Doc. # 39). On March 22, 2017, with the permission of the Court (Doc. # 61), Plaintiff filed his second Amended Complaint against AP/AIM and Ecolab. (Doc. # 62).

According to Plaintiff, he began working at the Embassy Suites in Covington, Kentucky, as a maintenance engineer on September 30, 2015. (Doc. # 62 at 2-3). AP/AIM is alleged to be the owner and operator of the Embassy Suites, as a franchisee

1

of Hilton. *Id.* Plaintiff was employed onsite by Aimbridge Hospitality, LLC ("Aimbridge"), which is the company responsible for operating and managing the Embassy Suites hotel and building. *Id.* at 5-7. Plaintiff alleges that two cases of Legionnaires' disease "were reported by [the] CDC to be associated with the Embassy Suites on August 14, 2015," and AP/AIM had knowledge of the report by September 2015. *Id.* at 2.

As a maintenance engineer, Plaintiff alleges that he worked "in the vicinity of the pool/spa area" on a daily basis. *Id.* at 3. According to Plaintiff, on November 1, 2015, the pool/spa was shut down and Plaintiff was "given instructions to manually clean out the sand filter" and was thereby exposed to the *Legionella* bacteria. *Id.* Plaintiff claims that he was also exposed to the *Legionella* bacteria "throughout the potable water system by releasing air bubbles as part of his work as well as by passing by the Embassy Suites' indoor water feature." *Id.*

Plaintiff further alleges that his symptoms began showing within one week, and that by November 13, 2015, he was found unconscious by his daughter and taken to the hospital. *Id.* According to Plaintiff, he then spent almost two weeks in the hospital, and on November 22, 2015, was diagnosed with Legionnaires' disease. *Id.* Plaintiff alleges that he spent the next two months recuperating, was lethargic, coughing, fatigued from pneumonia, and required the use of an oxygen tank. *Id.* Plaintiff states that he was "fearful of going back to work," believing that he had contracted Legionnaires disease at the Embassy Suites, and "did not feel safe working in that environment." *Id.* at 4. Eventually, Plaintiff alleges that he experienced worsening symptoms of fatigue, accompanied by panic, inability to sleep, anxiety, and "psychological" grief. *Id.* Plaintiff alleges that he is "unable to work effectively" since he became "seriously ill," and has

2

"incurred significant medical bills, lost wages and earning capacity, endured pain and suffering, and loss of life's pleasure." *Id*.

As a result, Plaintiff brought this action against AP/AIM, alleging a negligence claim against AP/AIM, and negligence and products liability claims against Defendant Ecolab, the designer, supplier, distributer, marketer, and advertiser of the product that was supposed to ensure that the pool/spa water was cleaned and sanitized. *Id.* at 4-10. Specifically, Plaintiff alleges that AP/AIM negligently selected and managed Aimbridge to operate and manage the Embassy Suites hotel and building. *Id.* at 5-7.

In its Motion for Summary Judgment, AP/AIM argues that under the Kentucky Workers' Compensation laws, it is immune from tort actions by employees of its subcontractor, Aimbridge. (Doc. # 68). Plaintiff having responded (Doc. # 71), and AP/AIM having replied (Doc. # 72), this Motion is ripe for the Court's review.

## II. ANALYSIS

### A. Standard of Review

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of "showing the absence of any genuine issues of material fact." *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008). Once the moving party has met its burden, the nonmoving party must cite to evidence in the record upon which "a reasonable jury could return a verdict" in its favor; a mere "scintilla of evidence" will not do. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-52 (1986). At the summary-judgment stage, a court "views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's

3

favor." *Slusher v. Carson*, 540 F.3d 449, 453 (6th Cir. 2008).

**B.     Kentucky law provides up-the-ladder immunity for contractors.**

AP/AIM has moved for summary judgment, arguing that it enjoys full tort immunity under Kentucky law because it is an up-the-ladder employer under Kentucky's workers'-compensation scheme. (Doc. # 68-1, at 7-8) (citing Kentucky Revised Statutes §§ 342.690(1), 342.610(2)).[1]  "The Kentucky Workers' Compensation Act is a legislative remedy which affords an injured worker a remedy without proof of the common law elements of fault." *Cain*, 236 S.W.3d at 606.  To balance that remedy, two sections of this Act, when read in conjunction, give a contractor immunity from tort liability with respect to tort-related injuries of its subcontractors' workers so long as the contractor had workers' compensation coverage and the worker was injured performing work of the type that was a regular or recurring part of the contractor's business.  *Cain*, 236 S.W. 3d at 585 (discussing Ky. Rev. Stat. Ann. §§ 342.690(1) and 342.610(2)).

The contractor asserting this up-the-ladder defense has the burden of both pleading and proving the affirmative defense.  *Id.*  Thus, a contractor must prove the following: (1) that the work done by the subcontractor's employee was regular and recurring work of the contractor; and (2) that appropriate workers' compensation coverage existed.  If the contractor succeeds in this proof, "the company cannot be sued for a common law tort when the employee receives workers' compensation." *Littleton v. Ridley USA, Inc.*, No. 5:17-cv-479-JMH, 2018 WL 1369913, at *3 (March 16, 2018) (citing *Labor

---

[1]     When a federal court sits in diversity, as in this case, the court must apply the substantive law of the state in which the court is situated. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 73 (1938).  At issue in the present Motion is whether AP/AIM is a statutory contractor and employer, and thus immune from tort suit, under the Kentucky Workers' Compensation Act.  This is a "mixed question of law and fact and must be ascertained by the court, rather than by a jury." *Black v. Dixie Consumer Prods., LLC*, 516 F. App'x 412, 414 (6th Cir. 2013) (citing *General Electric Co. v. Cain*, 236 S.W.3d 579, 589 (Ky. 2007)).

*Ready Inc. v. Johnston*, 289 S.W.3d 200, 203 (Ky. 2009)); s*ee also Davis v. Ford Motor Co.*, 244 F. Supp.2d 784, 786 (W.D. Ky. 2003) ("Thus, if [the defendant] qualifies as a contractor under [Ky. Rev. Stat. Ann.] 342.610(2), then it has no liability in tort to [the plaintiff] because he has already received workers' compensation benefits through his immediate employer.")

### C. The work Plaintiff did for AP/AIM was not "regular or recurring."

The Sixth Circuit has crafted the "regular or recurring" analysis into a three-part inquiry, asking: (1) whether the injured person was "hired to perform" the work for the contractor,[2] (2) whether the injured person's work for the contractor was a customary, usual, or normal part of the contractor's business, or work that the subcontractor repeated with regularity, and (3) whether the injured person's work would normally be performed or be expected to be performed by the contractor's employees. *Black v. Dixie Consumer Prods., LLC*, 835 F.3d 579, 585 (6th Cir. 2016) (internal citations omitted).

The test to determine whether the type of work done by the subcontractor's employee is that which would be normally performed by the contractor or contractor's employee is a relative test, not an absolute one. *Id.* Each case must be "analyzed individually … based on the particulars of the relationship at issue." *Doctors Assocs., Inc. v. Uninsured Emp'rs Fund*, 264 S.W.3d 88, 92 (Ky. 2011). "A contractor that never performs a particular job with its own employees can still come within [Ky. Rev. Stat. Ann.] 342.610(2)(b)." *Id.* (citing *Fireman's Fund ins. Co. v. Sherman & Fletcher*, 705 S.W. 2d

---

[2] The *Black* opinion, citing *Cain*, suggests that the first inquiry is whether the subcontractor was "hired to perform" work for the contractor. But the *Cain* Court looked to whether the employees of the subcontractors were "hired to perform" the work for the contractor, so as to compare whether that work would be of the type that the contractor's employees would normally perform, or be expected to perform. The Court has paraphrased the language in *Black* to account for a more accurate reading of *Cain*.

5

459, 462 (Ky. 1986) ("Even though he may never perform that particular job with his own employees, he is still a contractor if the job is one that is usually a regular or recurrent part of his trade or occupation.").

Here, it is undisputed that Plaintiff was hired by Aimbridge to do work related to Aimbridge's obligations to AP/AIM. Plaintiff alleges he was hired to work as a maintenance engineer at the Embassy Suites. (Doc. # 62 at 3). In this capacity, he was an employee of Ambridge. (Docs. # 68-1 at 1; 71 at 8-9). And under the contract between Aimbridge and AP/AIM, Aimbridge was to hire "a sufficient number of personnel whom [Aimbridge] reasonably determines to be necessary or appropriate for the proper, adequate, and safe operation and management of the Hotel." (Doc. # 68-2 at 25). Thus, AP/AIM has satisfied the first prong of the "regular and recurring" test.

The next prong—whether the work Plaintiff did was a "customary or normal" part of AP/AIM's business, or work done with some degree of regularity—requires to Court to consider the "work being performed at the time of injury." *Black*, 835 F.3d at 585 (quoting *Estate of Dohoney ex rel. Dohoney v. Int'l Paper Co.*, 560 F. App'x 564, 569 (6th Cir. 2014). According to Plaintiff, he worked "in the vicinity of the pool/spa area daily throughout his time working at the Embassy Suites," and was "exposed to *Legionella* bacteria" when he was instructed to clean the pool/spa sand filter. (Doc. # 62 at 3). Alternatively, Plaintiff alleges that he was exposed to the *Legionella* bacteria "as part of his work" of releasing air bubbles "throughout the potable water system" and "passing by the Embassy Suites indoor water feature." *Id*. It was Plaintiff's job to maintain the pool/spa area on a daily basis. Such work, done daily, satisfies the "customary and normal" prong of the "regular and recurring" test. So too does the work Plaintiff alleges

6

alternatively exposed him to *Legionella* bacteria: the release of air bubbles was "part of his work." *Id*. Finally, Plaintiff indicates in his Second Amended Complaint that he might have contracted Legionnaires' disease as he was "passing by" the indoor water feature. *Id*. Plaintiff does not suggest that this was a one-time occurrence, but rather a regular activity that may have exposed him to the *Legionella* bacteria. AP/AIM has thus also satisfied the second prong of the "regular and recurring" test.

The third prong of the "regular or recurring" test is the subject of the bulk of Plaintiff's opposition to AP/AIM's Motion for Summary Judgment. *See* Doc. # 71 at 9-18. According to AP/AIM, it was "responsible for operating the hotel … [and] hired a professional third party manager (Aimbridge) for the asset that it owned and that Aimbridge was compensated for its management fee out of the general revenue of the hotel operation received by AP/AIM Rivercenter Suites, LLC." (Doc. # 68-1 at 16). AP/AIM also states that it "was in the hotel business." *Id*. AP/AIM further contends that the "services provided by Aimbridge and its employees to the owner of the hotel … constituted a regular and recurrent part of the business of the hotel." *Id*. at 22.

In direct contrast, Plaintiff argues that AP/AIM is not in the hotel business. (Doc. # 71 at 9). Plaintiff argues that the evidence supports, instead, that AP/AIM has not shown that it performs the duties associated with the operation and maintenance of a hotel. *Id*. In support of this Plaintiff cites to the testimony AP/AIM's designated agent Jayne A. Berger, where she averred that AP/AIM never had any employees involved in operating a hotel such as the Embassy Suites in Covington. *Id*. at 10. Plaintiff also cites to the testimony of another AP/AIM agent, Vincent Cuce, who confirmed that "Aimbridge was responsible for all activities necessary for the operation of the hotel." *Id*. at 12. Plaintiff

7

additionally argues that "representatives for both AP/AIM and Aimbridge admit that [AP/AIM] does not regularly engage in the operation of the hotel. Per the Agreement, this business is conducted 'exclusively and solely' by Aimbridge." *Id.* at 16.

In support of his Argument, Plaintiff cites to the Kentucky Supreme Court case *Doctors Assocs.*, 364 S.W.3d 88, which held that a Subway franchisor could not benefit from Kentucky's up-the-ladder workers' compensation immunity when it was not in the business of operating sandwich shops, but rather in the business of developing franchises to secure copyright royalties. Plaintiff contends that, similarly, AP/AIM was in the business of establishing and developing hotels to "secur[e] revenue streams rather than actually operating hotels." (Doc. # 71 at 17-18). According to Plaintiff, AP/AIM was not a hotel or an entity engaged in the operation of a hotel, but rather a "sophisticated financial vehicle for investors to make money, shelter their tax liability, and not actually be in the hotel business." *Id.* at 12-13.

In its reply, AP/AIM simply states that it was the legal owner of the hotel, with a permit to operate the hotel, at the time of the alleged injury to Plaintiff. (Doc. # 72 at 5-6).

Thus, the question the court must resolve is whether there is a genuine issue of material fact as to whether the work Plaintiff performed for Aimbridge would normally be performed or be expected to be performed by AP/AIM's employees, and therefore, whether summary judgment in favor of AP/AIM is appropriate as a matter of law. The answer to this question sits in between two Kentucky Supreme Court cases. In *Elkhorn-Hazard Coal Land Corp. v. Taylor*, 539 S.W.2d 101, 103-04 (Ky. 1976), the Kentucky Supreme Court held that the "lessor of mineral rights to coal was not liable for payment

of workers' compensation benefits to the lessee's employees because the lessor was in the business of leasing, not mining." *Cain*, 236 S.W.3d at 585-86. In contrast, the Kentucky Supreme Court held in *Fireman's Fund Ins.,* 705 S.W.2d at 462, that a contractor engaged in the business of building construction was an up-the-ladder employer to the employee of a rough-framing subcontractor, because "rough framing carpentry is work of a kind which is regular or recurrent part of the work of the business of building construction." More recently, the Kentucky Supreme Court has affirmed an administrative law judge's finding that a franchisor was "in the business of franchising, not the business of selling sandwiches." *Doctors Assocs.*, 364 S.W. 3d at 93.

Despite its contention, AP/AIM has not met its burden of showing that it is in the hotel business. In fact, AP/AIM does not seem to have a useful and clarifying definition of what might constitute "in the hotel business." *See* Doc. # 68-15 at 5 ("Q: If Aimbridge did all the things that were ... in the paragraph we talked about, the inventories and so on and so forth, running the operations the accounts and so on, how can AP/AIM be in the hotel business? A: [Vincent Cuce] Anyone can be in the hotel business. Q: True. A: You could be in the hotel business."). In addition, the testimonial evidence of AP/AIM's agent Jayne Berger suggests that ownership of the property was functionally unconnected to management and operation of the Embassy Suites hotel. (Doc. # 68-16 at 2) ("Q: What was the procedure that was employed by [AP/AIM] to employ Aimbridge? A: [T]here wasn't one. Aimbridge was the manager prior to [AP/AIM's] ownership of the property. We [were] confident in Aimbridge's ability to continue as manager… [Aimbridge] had run a seemingly positive, good business at the hotel."). Viewing the evidence in the light most favorable to Plaintiff, the Court finds that the facts here are more akin to *Taylor*, 539

9

S.W.2d 101, and *Doctors Assocs.*, 364 S.W. 3d 88, than they are to *Fireman's Fund,* 705 S.W.2d 459.

AP/AIM offers no evidence and points to no facts that support the argument that Plaintiff was doing the work that AP/AIM's employees would customarily do when he was injured. *See* Docs. # 68 and 72. This is because "all employees of the hotel … are required to be employees of [Aimbridge] or its affiliates." (Doc. # 68-3 at 2). In light of the testimony that AP/AIM has no employees in the hotel management or operations business, and that AP/AIM expected Aimbridge to use revenue from hotel guests and visitors to fund the daily operation and management of the hotel, AP/AIM is more akin to the franchisor or lessee in *Doctors' Assocs*. or *Taylor*, whose business was not the underlying business, but the development and exploitation of the underlying business. Furthermore, unlike *Fireman's Fund*, AP/AIM does not appear to be in the business of operating or managing hotels, with specific functions subcontracted out to third parties. Rather, AP/AIM appears to be in the business of purchasing the rights to certain properties, and then having third-party companies take over turnkey operations and management.

Although "'up-the ladder' immunity may extend to a party even where the party never earlier performed the work with its own employers," courts must "narrowly constru[e] the immunity provisions" of Kentucky's workers' compensation laws. *Smith v. N. Am. Stainless LP*, 158 F. App'x 699, 709 (6th Cir. 2005) (quoting *Boggs v. Blue Diamond Coal Co.*, 590 F.2d 655, 658-59 (6th Cir. 1979)). Here, because AP/AIM has not shown that Plaintiff was engaged in the type of work that would be normally carried out by AP/AIM's employees, AP/AIM not met its burden to show that the work Plaintiff did

was "regular or recurring" under the test to determine whether AP/AIM is an up-the-ladder employer.

Having determined that AP/AIM has not met its burden on this element, the Court will decline to consider whether AP/AIM had "secured the payment of workers' compensation" with respect to Plaintiff. AP/AIM's Motion for Summary Judgment will be **denied.**

III. CONCLUSION

Accordingly, for the reasons stated herein, **IT IS ORDERED** that Defendant AP/AIM Rivercenter Suites, LLC's Motion for Summary Judgment (Doc. # 68) is **DENIED**.

This 10th day of April, 2018.



Signed By:
*David L. Bunning*
United States District Judge

K:\DATA\ORDERS\Cov16\16-78 Tartar v AP-AIM Rivercenter MOO.docx