**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

CIVIL ACTION NO. 16-78-DLB-CJS

PAUL TARTER                                                                                    PLAINTIFF

v.                              <u>**MEMORANDUM OPINION AND ORDER**</u>

AP/AIM RIVERCENTER SUITES, LLC, et al.                                    DEFENDANTS

** ** ** ** **

This matter is before the Court on three motions—Defendant AP/AIM Rivercenter
Suites LLC's ("AP/AIM") Joint Motion for Reconsideration of the Court's April 10, 2018
Order and AP/AIM's Second Motion for Summary Judgment (Doc. # 83), Defendant
Ecolab Inc.'s ("Ecolab") Motion for Summary Judgment (Doc. # 85), and Ecolab's Motion
to Strike Plaintiff's Sur-Reply (Doc. # 97).  The Court has reviewed the motions and
supporting documentation, as well its prior Orders and previously-submitted evidence.
The Court has determined that AP/AIM's Motion for Reconsideration is procedurally
improper and, therefore, is **denied**.  AP/AIM's Second Motion for Summary Judgment is,
however, **granted**, Ecolab's Motion for Summary Judgment shall be **granted in part** and
**denied in part,** and Ecolab's Motion to Strike shall be **granted** for the reasons set forth
below.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

This case arose after Plaintiff Paul Tarter contracted Legionnaires' disease in
November 2015.  (Doc. # 62 at 3).  Tarter began working as a maintenance engineer at
the Embassy Suites in Covington, Kentucky on September 30, 2015. *Id.* at 2-3.  AP/AIM

is alleged to be the owner and operator of the Embassy Suites, as a franchisee of Hilton. *Id*. Plaintiff was employed onsite by Aimbridge Hospitality, LLC ("Aimbridge"), which is the company responsible for operating and managing the Embassy Suites hotel and building. *Id*. at 5-7. Part of Tarter's job included daily work "in the vicinity of the pool/spa area" at the hotel. *Id.* at 3.

While the pool at the Embassy Suites was managed by employees at the hotel, maintenance support was also provided through the "Aqua Balance Pool & Spa Program" ("Aqua Balance")—a service which Ecolab provided to the Embassy Suites in Covington. (Doc. # 62 at 5). As part of this program, Ecolab installed a remote-monitoring system in the pool facility which would measure the level of chemicals in the pool and spa water, and dispense certain chemicals as needed. (Doc. # 85-4 at 3). The system would also send alerts to the Ecolab headquarters when the chemical balance in the pool or spa was off; Ecolab would then automatically send a fax to the hotel alerting the hotel of the problem and recommending ways to restore the appropriate chemical levels in the pool or spa. *Id.* Ecolab, additionally, provided in-person support and training to help organizations properly and safely maintain their pools and spas. (Doc. # 85-5 at 47:4-10). One of the goals of the Aqua Balance program is to help an organization "achieve sanitized and fresh water" based upon state regulations. *Id.* at 48:19-24. (Dennis Fitzpatrick, an employee of Ecolab, testifying about the Aqua Balance program).

Between late July and November 2015, Ecolab sent 523 alerts to the Embassy Suites notifying of problems with the chemical balance in the pool and spa at the hotel, (Doc. # 88-10 at 119:1-121:21), or notifying that "there's no water flowing through [the] sample cell in [the] system." (Doc. # 88-11 at 32:11-12) (Joel Flom, Customer Support

Supervisor at Ecolab, explaining what the "no flow" alert meant). Around the same time, there were problems with the Ecolab controller installed at the Embassy Suites. (Doc. # 88-3 at 1, 5, 7, 18); *see also* (Doc. # 90-2 at 26:7-8) (Ray Toepfert, employee at the Embassy Suites, testifying that the controller "was always going off, an alarm, I'm going to say false alarms to a certain extent").

On November 1, 2015, Tarter was instructed "to manually clean out the sand filter" for the pool and spa; this required him to scoop a large quantity of "slimy" sand out of the filter and replace it with 500 pounds of new sand, without any type of respiratory protection. (Docs. # 62 at 3, 85-1 at 2 and 85-10 at 45:8-49:12). Tarter claims that he was exposed to the *Legionella* bacteria while cleaning out the sand filter and during his other work with and near the potable-water system at the Embassy Suites. (Doc. # 62 at 3).

Tarter first became ill on November 7, 2015 and was diagnosed with Legionnaires' disease on November 22, 2015. *Id.* He was the third person associated with the Embassy Suites in Covington to contract the disease; the first two instances were reported to the Centers for Disease Control and Prevention in August 2015. *Id.* at 2. Despite testing, no definitive link was ever established between water at the Embassy Suites hotel and *Legionella* bacteria. (Doc. # 85-9 at 1-2). Two plaintiff's experts who reviewed the circumstances of Tarter's illness, however, believe that he was exposed to *Legionella* bacteria when cleaning out the pool filter at the Embassy Suites. (Docs. # 85-13 at 3 and 85-14 at 10).

Beginning on November 11, 2015, Tarter was unable to work due to his illness. (Doc. # 62 at 3). His daughter found him unconscious on November 13, 2015, and he

was hospitalized from November 13 to November 25, 2015. *Id.* Tarter made six outpatient, follow-up visits to the hospital between December 2015 and April 2016, complaining of symptoms of pneumonia, fatigue, weakness, and anxiety. *Id.* at 3-4. The disease left Tarter unable to work for months after, and he "has been unable to work effectively since his illness." *Id.*

As a result, Plaintiff Paul Tarter ("Tarter") initiated this suit against AP/AIM on May 10, 2016. (Doc. # 1). AP/AIM filed a Motion for Summary Judgment on August 9, 2016 (Doc. # 18) which the Court denied as premature on September 14, 2016. (Doc. # 34). Defendants were given permission to renew their motion after "the discovery period related to the issue of up-the-ladder immunity expire[d]." *Id.*

With permission of the Court, Tarter filed an Amended Complaint on October 25, 2016 which added Ecolab as a defendant. (Doc. # 39). A Second Amended Complaint was filed with leave of Court on March 22, 2017. (Doc. # 62). This Complaint brought a claim for negligence against AP/AIM and two claims against Ecolab—a negligence claim and a strict products-liability claim. *Id.* Plaintiff specifically alleged that AP/AIM negligently selected and managed Aimbridge to operate and manage the Embassy Suites hotel and building. *Id.* at 5-7. Additionally, Tarter alleges that Ecolab was "negligent and failed to exercise reasonable care to avoid foreseeable injury and harm to the Plaintiff when it designed, distributed, marketed, promoted, and sold the services associated with its Aqua Balance System." *Id.* at 7. Tarter also brought a strict products-liability claim against Ecolab, arguing that products "associated with its Aqua Balance System" were "inherently dangerous and posed an increased risk of harm to the Plaintiff." *Id.* at 9.

AP/AIM filed a Renewed Motion for Summary Judgment on September 8, 2017 (Doc. # 68) which the Court denied on April 10, 2018. (Doc. # 82). Now before the Court is AP/AIM's Motion for Reconsideration and Second Motion for Summary Judgment, which AP/AIM filed on April 27, 2018. (Doc. # 83). With this motion, AP/AIM provided new evidence including the Franchise Agreement between Hilton Franchise Holding LLC and AP/AIM, and citations issued to AP/AIM from the Kentucky Labor Cabinet Office of Occupational Safety and Health. (Docs. # 84-1 and 89-1). Tarter responded on May 16, 2018 (Doc. # 87), AP/AIM replied on May 26, 2018 (Doc. # 89), and Tarter filed a sur-reply on June 5, 2018 (Doc. # 94). The motion is now ripe for the Court's review.

Additionally, on May 3, 2018, Ecolab moved for summary judgment on both of the claims against it. (Doc. # 85). Tarter responded on May 22, 2018 (Doc. # 88) and Ecolab replied on June 1, 2018. (Doc. # 90). Tarter filed a sur-reply without leave of court on June 8, 2018 (Doc. # 96) and Ecolab moved to strike the sur-reply as improper on June 12, 2018. (Doc. # 97). Tarter having failed to respond to Ecolab's Motion to Strike (Doc. # 97) within the required timeframe, *see* LR 7.1(c), both motions are also ripe review. The Court will address each motion in turn.

## II. AP/AIM'S JOINT MOTION TO RECONSIDER AND SECOND MOTION FOR SUMMARY JUDGMENT

### A. Motion to Reconsider

Federal Rule of Civil Procedure 59(e) allows a court to review and reconsider a previous decision and grant a motion to reconsider "if there is clear error of law, newly discovered evidence, an intervening change in the controlling law, or to prevent manifest injustice." *Johnson v. Interstate Brands Corp.*, 351 F. App'x 36, 38 (6th Cir. 2009); Fed. R. Civ. P 59(e). Such a motion, however, cannot be brought after the denial of summary

judgment; Rule 59(e) only applies to final judgments, and a denial of summary judgment is not final. *Turk v. Comerford*, 1:09-cv-868, 2011 WL 1899209 at *3 (N.D. Ohio, May 19, 2011), *aff'd in part, rev'd in part on other grounds*, 488 F. App'x 933 (6th Cir. 2012) (citing *Cameron v. Ohio*, 344 F. App'x 115, 117-18 (6th Cir. 2009)). "[W]here a motion seeks reconsideration of a denial of summary judgment, the court treats the motion as a renewed summary judgment and is 'therefore free to reconsider or reverse its decision for any reason.'" *Id.* (quoting *Cameron*, 344 F. App'x at 117-18).

In the instant case, AP/AIM styled its Motion as a "Motion to Reconsider and Defendant's Second Renewed Motion for Summary Judgment on Up the Ladder Immunity" and asks the court to reconsider its previous denial of summary judgment. (Doc. # 83). As a denial of summary judgment cannot be reconsidered, *see supra*, AP/AIM's Motion to Reconsider will be denied as procedurally improper. Accordingly, the Court will review the Motion only as a Second Motion for Summary Judgment. *Id.*

## B.    Summary Judgment Standard

A motion for summary judgment allows a court to grant judgment as a matter of law if there is no genuine dispute of material fact. Fed. R. Civ. P. 56. In making this determination, "the judge's function is not himself to weigh the evidence and determine the truth of the matter;" rather, the judge must consider if there is an issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he facts [must] be viewed in the light most favorable to the party opposing summary judgment." *Shelton v. Ky. Easters Seals Soc'y., Inc.* 413 S.W.3d 901, 905 (Ky. 2013); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007). And, "[a]ll reasonable inferences [are to be drawn] in favor of the non-moving party." *Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir. 2011).

The Court must deny summary judgment if there are any factual issues "that properly can only be resolved by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. Accordingly, the party opposing the motion must show more than "metaphysical doubt" about the facts of the case. *Lossia v. Flagstar Bancorp, Inc.*, 859 F.3d 423, 428 (6th Cir. 2018) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "A mere scintilla of evidence [in favor of the non-moving party] is insufficient" to defeat summary judgment. *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999) (quoting *Anderson*, 477 U.S. at 252). Additionally, the evidence submitted by the parties supporting or opposing summary judgment must be admissible. *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir. 1997).

### C.    Review under Diversity Jurisdiction

This personal-injury case comes before the Court on diversity jurisdiction. (Doc. # 62 at 1). Under *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), a federal court sitting in diversity must apply the substantive law of the state in which it is sitting. *See Hanna v. Plumer*, 380 U.S. 460, 466 (1965) (explaining *Erie*). When deciding such a case, it is the job of the federal court to "try to make sense of the case law and to apply state law in accordance with the controlling decisions of the state [where the federal court is located]." *Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir. 1999) (citing *Erie R.R. Co.*, 304 U.S. 64) (quotations omitted). When the highest court of a state has not yet ruled on the issue before the federal court, it is up to the federal court to determine how the highest court would decide the case. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 636 (6th Cir. 2018).

Stated differently, the Court is to "predict how the [state supreme] court would rule by looking to all the available data." *Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 453 (6th Cir. 2001). "The Court may use the decisional law of the state's lower courts, other federal courts construing state law, restatements of law, law review commentaries, and other jurisdictions on the 'majority' rule in making this determination." *Meridian Mut. Ins. Co.*, 197 F.3d at 1181 (citing *Grantham & Mann v. Am. Safety Prods.*, 831 F.2d 596, 608 (6th Cir. 1987)).

As there are no Kentucky Supreme Court decisions directly on point, the Court must predict how the Kentucky Supreme Court would dispose of this Motion. *See Pittman*, 901 F.3d at 636. Following the direction of the Sixth Circuit, this Court will also look to "the decisions (or dicta) of the Kentucky Supreme Court in analogous cases" and "pronouncements from other Kentucky courts" for guidance. *State Auto Prop. and Cas. Ins. Co. v. Hargis*, 785 F.3d 189, 195 (6th Cir. 2015). When interpreting Kentucky statutes, the Court is directed to ascertain and give effect to the intent of the legislature. *Vance v. Amazon.com*, 852 F.3d 601, 610 (6th Cir. 2017) (quoting *Beshear v. Haydon Bridge Co., Inc.*, 304 S.W.3d 682, 703 (Ky. 2010)).

### D.   Summary Judgment Analysis on Up-the-Ladder Immunity

The issue before the Court is whether summary judgment should be granted to AP/AIM in view of Kentucky's workers'-compensation scheme, which provides certain contractors with immunity from suits by injured employees. *See* Ky. Rev. Stat. §§ 342.610(2), 342.690(1); (Doc. # 83 at 1-11). "The Kentucky Workers' Compensation Act is a legislative remedy which affords an injured worker a remedy without proof of the common law elements of fault." *Gen. Elec. Co. v. Cain*, 236 S.W.3d 579, 606 (Ky. 2007).

The workers'-compensation remedy in Kentucky is exclusive, and, therefore, employers who "secure payment of compensation" as required by the workers'-compensation statute are immune from other liability potentially arising from an on-the-job injury. *See* Ky. Rev. Stat. § 342.690(1).

Under this scheme, contractors are immune from workers' compensation and personal-injury claims, so long as their subcontractors carry workers'-compensation insurance. *See* Ky. Rev. Stat. §§ 342.610(2), 342.690(1). Specifically, "[i]f premises owners are 'contractors' as defined in KRS [§] 342.610(2)(b), they are deemed to be the statutory or 'up-the-ladder,' employers of individuals who are injured while working on their premises." *Cain*, 236 S.W.3d at 585. These contractors are liable for work-related injuries "unless the individuals' immediate employers [the subcontractors] . . . have provided workers' compensation coverage." *Id.* The result is that as contractors, the premises owners "are immune from tort liability with respect to work-related injuries" so long as (1) "the worker was injured while performing work that was 'of a kind which is a *regular or recurrent part* of the work of the trade, business, occupation or profession' of the owner" and (2) the subcontractor employing the injured employee provides for workers' compensation. *Id.* (quoting Ky. Rev. Stat. § 342.610(2)) (emphasis added). While the law does shield "owners or contractors from potential tort liability," the original purpose of the scheme was "to assure that contractors and subcontractors provide workers' compensation coverage." *Cain*, 236 S.W.3d at 587. Up-the-ladder immunity is an affirmative defense, and a defendant bears the burden of asserting and proving this defense to liability. *Id.* at 585.

Proof of a subcontractor having workers' compensation insurance is sufficient to show that the subcontractor has provided the requisite workers' compensation coverage. *Id.* at 605. As proof of Aimbridge's workers compensation insurance has been submitted to the Court, *see* (Docs. # 68-14 and 68-17), AP/AIM would have up-the-ladder immunity if AP/AIM is found to be a contractor under the law. *Cain*, 236 S.W.3d at 605.

The question before the Court, therefore, is whether there remains a genuine issue of material fact about AP/AIM's status as a contractor. If there is no genuine issue of material fact that AP/AIM is a contractor under Kentucky law, then summary judgment is appropriate as, by law, AP/AIM would be immune from this suit under the up-the-ladder immunity provisions discussed above. "[A] conclusion that a defendant is entitled to judgment as a matter of law must be supported by substantial evidence that a defendant was the injured worker's statutory employer under a correct interpretation of KRS [§] 342.610(2)(b)." *Cain*, 236 S.W.3d at 585.

Accordingly, whether AP/AIM is a contractor, and therefore a statutory employer, turns on the statutory definition found in Ky. Rev. Stat. § 342.610(2).[1] Subparagraph 2(b)

---

[1]    A contractor who subcontracts all or any part of a contract and his or her carrier shall be liable for the payment of compensation to the employees of the subcontractor unless the subcontractor primarily liable for the payment of such compensation has secured the payment of compensation as provided for in this chapter. Any contractor or his or her carrier who shall become liable for such compensation may recover the amount of such compensation paid and necessary expenses from the subcontractor primarily liable therefor. A person who contracts with another:

> (a) To have work performed consisting of the removal, excavation, or drilling of soil, rock, or mineral, or the cutting or removal of timber from land; or
>
> (b) To have work performed of a kind which is a regular or recurrent part of the work of the trade, business, occupation, or profession of such person

shall for the purposes of this section be deemed a contractor, and such other person a subcontractor. This subsection shall not apply to the owner or lessee of land principally used for agriculture. Ky. Rev. Stat. § 342.610(2).

of the statute makes clear that a contractor includes someone who contracts with another "to have work performed of a kind which is a regular or recurrent part of the work of the trade, business occupation, or profession of such person." Ky. Rev. Stat. § 342.610(2)(b). The Kentucky Supreme Court has found that "regular or recurrent" work is "work that is customary, usual, or normal to the particular business (including work assumed by contract or required by law) or work that the business repeats with some degree of regularity, and it is of a kind that the business or similar businesses would normally perform or be expected to perform with employees." *Cain*, 236 S.W.3d at 588. "Stated simply, KRS [§] 342.610(2)(b) refers to work that is customary, usual, normal, or performed repeatedly and that the business or a similar business would perform or be expected to perform with employees." *Id.* at 589. This is not intended to be a strict, absolute test; rather, the test is relative and is to take into account a number of factors including: the "nature size and scope" of the business, "as well as whether its equipped with the skilled manpower and tools to handle the task the independent contractor is hired to perform." *Id.* The role of a contractor is to be construed "in a practical and functional— not hypertechnical—way." *Beaver v. Oakley*, 279 S.W.3d 527, 532-33 (Ky. 2009). A review of case law from the Sixth Circuit and the Kentucky Supreme Court suggests that there are different approaches to determining whether an entity is a contractor and whether work is "regular or recurrent." *Compare Black v. Dixie Consumer Prods.*, 835 F.3d 579, 585 (6th Cir. 2016) and *Cain*, 236 S.W.3d at 586 (collecting cases described *infra*).

The Sixth Circuit analyzes whether work being performed is "regular or recurrent" using a three-part test. *See Black*, 835 F.3d at 585. Specifically, the Sixth Circuit looks

at three issues—(1) if the subcontractor was hired to perform the work for the contractor, (2) if the subcontractor's work was "a customary, usual or normal part" of the contractor's business or if it is work that the contractor "repeats with some degree of regularity," and (3) if the work done by the subcontractor is that which the contractor "would normally perform or be expected to perform with employees." *Id.* (internal quotations omitted). The Sixth Circuit has held that if the three inquires ("the *Black* test") are answered in the affirmative, the work being performed is "regular or recurrent" and, therefore, the entity is a contractor for the purposes of Ky. Rev. Stat. § 342.610(2)(b). *Id.*

This Court has already found that there is no genuine issue of material fact as to the first two inquiries—Aimbridge was hired to perform the hotel maintenance work for AP/AIM and the hotel maintenance work is a usual part of AP/AIM's business that is repeated with some degree of regularity. (Doc. # 83 at 6-7). Now before the Court is the question of whether the additional evidence presented by AP/AIM eliminates the genuine issue of material fact as to the third prong of the *Black* test—whether the hotel maintenance work performed by Tarter and Aimbridge was work that AP/AIM or a similar business would normally perform or be expected to perform with employees. *Black*, 835 F. 3d at 585. The Court finds that it does.

In *Black*, the plaintiff, an employee of a trucking company, was injured while unloading a truck of raw materials at a Dixie Consumer Products, LLC ("Dixie") plant. *Id.* at 581. The plaintiff sued Dixie, a company that uses raw materials to make paper cups and plates, to recover for his injuries, but the Sixth Circuit found Dixie to be entitled to up-the-ladder immunity as a contractor of the trucking company. *Id.* at 581, 586. Regarding the third prong of the *Black* test, the Sixth Circuit found that "the transportation and

delivery of raw paper materials amount to 'work that Dixie or similar businesses would normally perform or be expected to perform with employees.'" *Id.* at 586. Specifically, the Circuit explained that transporting raw materials from the supplier to the plant "is work that a company similar to Dixie might very well handle or be expected to handle with its own private fleet." *Id.* Additionally, "'[e]ven though' Dixie 'may never perform that particular job with [its] own employees, [it] is still a contractor if the job is one that is usually a regular or recurrent part of [its] trade or occupation." *Id.* (quoting *Fireman's Fund Ins. Co. v. Sherman & Fletcher*, 705 S.W.2d 459, 462 (Ky. 1986)).

Here, the Court must consider whether the maintenance activities undertaken by Aimbridge and Tarter are of the sort that a "company similar to [AP/AIM] might very well handle or be expected to handle with its own" employees. *Id.* at 586. Before addressing that question, the Court must first consider what kind of company AP/AIM is; the Court finds that AP/AIM is clearly involved in the hotel business. In addition to AP/AIM holding a lease for the property on which to operate a hotel, (Doc. # 83-5), and holding a permit to operate a hotel in their name, (Doc. # 83-2), the Management Agreement makes clear that AP/AIM is involved in some of the upper-level management of the Embassy Suites Rivercenter. *See* (Doc. # 68-2).

For example, Article 4 of the Management Agreement specifically states that "Owner [AP/AIM] may at any time converse with Manager's [Aimbridge] senior officers regarding any subject affecting or relating to the Hotel, and Manager [Aimbridge] shall instruct such senior officers to disclose fully to Owner [AP/AIM] all information regarding the operation of the hotel." *Id.* at 25. Additionally, the Management Agreement includes that "Owner [AP/AIM] may at any time consult or communicate with Manager [Aimbridge]

regarding any of the Hotel Employees" and that "Owner [AP/AIM] shall have the right to consult with the Manager [Aimbridge] and have reasonable rights of approval with respect to the hiring, initially and with respect to any replacement, of the Executive Personnel." *Id.* at 26. The Agreement requires Aimbridge to, when hiring executive personnel, notify AP/AIM of candidates and their qualifications and provide an opportunity for AP/AIM to interview the candidates if they so choose; AP/AIM is also given the option to object to hiring a certain candidate. *Id.* The agreement additionally requires AP/AIM to approve budgets and participate in other hotel operations including marketing, contracting food and services, collective bargaining, security, and capital improvements, among other things. *Id.* at 27-35. This evidence leads the Court to conclude that AP/AIM is in the hotel business, and, is unlike *Elkhorn-Hazard Coal Land Corp. v. Taylor*, cited by Tarter, *see* (Doc. # 94 at 8), where "the Corporation's only role was to lease mineral rights to another coal company which actually mined the coal from the site." *JW Res., Inc. v. Caldwell*, 2015-CA-001802-MR, 2017 WL 1102984 at *3 (Ky. Ct. App. Mar. 24, 2017) (citing *Elkhorn-Hazard Coal Land Corp. v. Taylor*, 539 S.W.2d 101 (Ky. 1976).

The work at issue here is maintenance of the pool/spa and elements of the hotel's potable water system. (Doc. # 62 at 3). Hotel maintenance "is work that a company similar to [AP/AIM] might very well handle or be expected to handle with its own" employees. *Black*, 835 F. 3d at 586. With this Motion, AP/AIM has provided the Franchise Agreement between AP/AIM and Hilton Franchise Holding LLC. (Doc. # 84-1). This contractual agreement legally obligates AP/AIM to undertake certain duties including operating the hotel "in such a manner to provide . . . high quality lodging and other services," "comply[ing] with Laws," and meeting all of Hilton's standards regarding

operating and maintaining the hotel.  *Id.* at 9, 12-13.  This evidence demonstrates that, by law, AP/AIM is contractually obligated to participate in some tasks involved in the day-to-day operations of the hotel business, including hotel maintenance and operations.

AP/AIM also cites to the permit to operate a hotel issued by the Commonwealth of Kentucky in AP/AIM's name.  (Doc. # 83-2).  Such a permit is required for all hotel operators in the Commonwealth of Kentucky and is "issued only for the premises and person named in the application and shall not be transferable."  Ky. Rev. Stat. § 219.021.  Kentucky regulations specifically require holders of such a state-issued permit to undertake specific duties including the maintenance of the potable hotel water supply and hotel swimming facilities, among many other things.  *See* 902 Ky. Admin. Reg. 7:010.  These regulations legally obligate AP/AIM to undertake operations and maintenance tasks at the Embassy Suites hotel at issue—including maintaining the pool.  AP/AIM also provided copies of citations issued by the Kentucky Labor Cabinet Office of Occupational Safety and Health for unrelated violations committed by AP/AIM at the hotel.  (Doc. # 89-1).  The issuance of such citations in AP/AIM's name, rather than Aimbridge's name, further supports the proposition that AP/AIM has legal obligations relating to operations of the hotel.

In combination, this evidence demonstrates that if AP/AIM did not contract out these operations and maintenance responsibilities to Aimbridge, these would be tasks that AP/AIM, a company in the hotel business, would be "expected to handle with its own" employees.  *Black*, 835 F. 3d at 586.  While AP/AIM may not manage the day-to-day operations and maintenance of the hotel, there can be no dispute that, AP/AIM is involved, and in some cases contractually required to participate, in the upper-level management

of the hotel. *Black* makes clear that participation in one aspect of the business (e.g. turning raw materials into paper products) is sufficient to establish that a company would be "expected to handle" other aspects of the business (e.g. transporting the raw materials to the plants). *Id.* As a matter of law, the Court finds the maintenance work carried out by Aimbridge, and its employee Tarter, to satisfy the third-prong of the *Black* test and be regular and recurrent. *Id.*

The fact that AP/AIM does not have any employees participating in maintenance of the hotel does not change this conclusion. The Kentucky Supreme Court has found, and the Sixth Circuit has reiterated, that an entity can be a contractor even if it would never perform the tasks with their own employees. *Fireman's Fund Ins. Co.*, 705 S.W.2d at 462; *see also Black*, 835 F. 3d at 586. This principle has also been affirmed recently by the Kentucky Court of Appeals. *See Estate of Young v. ISP Chems., LLC*, 2017-CA-000838-MR, 2018 WL 2277395 at *5 (Ky. Ct. App. May 18, 2018) (quoting *Doctors' Associates, Inc. v. Uninsured Employers' Fund*, 364 S.W.3d 88, 92 (Ky. 2011)). Thusly, AP/AIM can still be found to be a contractor in this case as a matter of law even though no AP/AIM employee is involved in day-to-day hotel operations and maintenance tasks.

Under an analytical framework separate from the *Black* test, the Kentucky Supreme Court has suggested that legally-required and contractually-required activities are considered "regular and recurrent" under Ky. Rev. Stat. § 342.610(2)(b). *See Cain*, 236 S.W.3d at 586 (collecting cases described *infra*); *see also Bolin v. Wickliffe Paper Co.*, 5:10-cr-186, 2011 WL 2710620 at *3-*4 (W.D. Ky. July 12, 2011) (finding that "regular [yearly] cleaning of the tanks ensured both the safety of Wickliffe's employees and its compliance with state and federal air quality standards" and thus was regular and

recurrent); *Forbes v. Dixon Elec., Inc.*, 332 S.W.3d 733, 738 (Ky. Ct. App. 2010) (holding that "[b]y virtue of [Dixon Electric's] contract . . . to install and repair traffic signals throughout the city, Dixon Electric has to provide for traffic control . . . [which is] unquestionably a regular and recurrent part of Dixon Electric's business"). *Cain* cites to and affirms two Kentucky Court of Appeals cases in support of this principal. *Id.* Summarizing *Daniels v. Louisville Gas and Elec. Co.*, the *Cain* court explains that emissions tests at coal-fired electric generating stations are regular and recurrent because the tests were *required by the Environmental Protection Agency*. *Cain*, 236 S.W.3d at 586 (citing *Daniels v. Louisville Gas and Elec. Co.*, 933 S.W.2d 821, 824-24 (Ky. Ct. App. 1996)). *Cain* also explains *Tom Ballard Co. v. Blevins*, where the Court of Appeals found that a mining company was a contractor of truck drivers because the "mining company [was] *under contract[] to both mine and deliver*." *Cain*, 236 S.W.3d at 586 (citing *Tom Ballard Co. v. Blevins*, 615 S.W.2d 247 (Ky. Ct. App. 1980)) (emphasis added). To summarize, "[i]n *Blevins*, the work performed by the injured worker became a part of the mining company's business by contract, whereas in *Daniels*, it became a part of the utility company's business by law," and in both cases the work was found to be a regular and recurrent part of the obligated-company's business. *Cain*, 236 S.W.3d at 586.

Here, the Kentucky hotel and permit regulations clearly require that AP/AIM maintain the pool/spa and the potable water system, and therefore the maintenance activities undertaken by Tarter are required by law. *See* Ky. Rev. Stat. §§ 219.021, 219.041; 902 Ky. Admin. Regs. 7:010. Also, the Franchise Agreement contractually requires AP/AIM to maintain the hotel at an appropriate standard, which would include

cleaning and maintaining these aspects of the hotel. (Doc. # 84-1 at 9, 12-14). As these maintenance tasks, and others, are both contractually and legally required and are part AP/AIM's hotel business involvement, Kentucky courts would find these to be "regular and recurrent" tasks as a matter of law; this indicates that AP/AIM is a contractor. *See Cain*, 236 S.W.3d at 586.

The Franchise Agreement (Doc. # 84-1) provided in support of this Motion makes clear that *Doctors' Associates, Inc.*, a case cited by Tarter and the Court previously, can no longer inform the Court's decision. 364 S.W.3d at 88; (Docs. # 82 and 87). Under *Doctors' Associates, Inc.*, the Court found that the franchisor (DAI) was not a contractor, and therefore not entitled to up-the-ladder immunity as the "vast majority of DAI's business was to act as a franchisor who licensed others to operate Subway stores." *Id.* at 93-94. The Administrative Law Judge (ALJ) whose ruling was affirmed by the case found that "DAI [the alleged contractor] was in the business of franchising, not the business of selling sandwiches." *Id.* at 93. In reaching this conclusion, however, the ALJ noted that the agreement between Watash and DAI "required Watash [the alleged subcontractor] to pay DAI [the alleged contractor] a fee rather than the reverse;" this suggests that the outcome of the case would have been different if the DAI was paying Watash to operate the Subway. *Id.* at 91.

*Doctors' Associates, Inc.* would be analogous to the case at bar if Tarter were suing Hilton Franchise Holding LLC—the franchisor who granted AP/AIM the rights to use the Embassy Suites logo, and the company to which AP/AIM paid for that privilege—but the newly-submitted Franchise Agreement presented makes clear this is not the case. *See* (Doc. # 84-1). The reasoning of *Doctors' Associates, Inc.* does not apply in this case

as Tarter is suing the *franchisee* (AP/AIM) and *not the franchisor* (Hilton Franchise Holding LLC). *Doctors' Associates, Inc.*, 364 S.W.3d at 90-91, 93-94. Further, the reasoning which seems to underly the ALJ's initial decision in the *Doctors' Associates, Inc.* case suggests that AP/AIM certainly is a contractor entitled to up-the-ladder immunity as AP/AIM was paying Aimbridge, "rather than the reverse." *Id.* at 91. While some profits are being passed on from Aimbridge to AP/AIM, this is not a situation where Aimbridge is paying AP/AIM for the privilege of operating a hotel under AP/AIM's name like in *Doctors' Associates, Inc.*; rather Aimbridge is being provided fees by AP/AIM to manage the hotel on AP/AIM's behalf. 364 S.W.3d at 91; (Doc. # 68-2 at 40).

The finding of the Court, that AP/AIM is a contractor as a matter of law, is further supported by the legislative intent of the Workers' Compensation Act and up-the-ladder immunity. The purpose of the statute, as described by the Kentucky Supreme Court is to "discourage owners and contractors from hiring financially irresponsible contractors and subcontractors." *Elkhorn-Hazard Coal Land Corp*, 539 S.W.2d at 103. Here, looking at the circumstances of this case in light of the purpose of the act, AP/AIM is a contractor with up-the-ladder immunity as a matter of law. The Management Agreement between AP/AIM and Aimbridge requires that Aimbridge have workers' compensation insurance. (Doc. # 68-2 at 121). As AP/AIM has selected a subcontractor that will provide workers' compensation, as intended by the statue, the legislative intent also supports a finding that there is no genuine issue of material fact as to the status of AP/AIM as a contractor.

For all of the forgoing reasons, the Court finds that, as a matter of law, AP/AIM is a contractor under Ky. Rev. Stat. § 342.610(2) and therefore entitled to up-the-ladder immunity from this personal-injury suit. As there is clearly no longer any genuine issue

of material fact regarding up-the-ladder immunity, the Court must **grant** AP/AIM's Second Motion for Summary Judgment (Doc. # 83). Since the immunity question is dispositive in this case, the parties' arguments regarding premises liability are irrelevant, and need not be addressed by the Court.

### III.   ECOLAB'S MOTION TO STRIKE

Before addressing Ecolab's Motion for Summary Judgment (Doc. # 85), the Court must determine which documents will be considered in rendering its decision. Specifically, the Court must first dispose of Ecolab's Motion to Strike Plaintiff's Sur-Reply in Opposition to Ecolab's Motion for Summary Judgment (Doc. # 97), in which Ecolab argues that the Sur-Reply should be stricken because Tarter did not obtain leave of Court to file it. *Id.*

In the Eastern District of Kentucky "[a] motion is submitted to the Court for decision ... after the reply is filed, or the time for filing the response or reply has expired." LR 7.1(g). Neither the Local Rules nor the Federal Rules of Civil Procedure allow parties to file a sur-reply; rather, the party seeking to file such a motion must seek leave of Court. *Vaughn v. Hawkins*, 5:14-cv-00099, 2018 WL 2210873, at *2 (W.D. Ky. May 14, 2018) (citing *Key v. Shelby Cty.*, 551 F. App'x 262, 265 (6th Cir. 2014); *Eberhard v. Chicago Title Ins. Co.*, No. 1:11-cv-834, 2011 WL 12756822, at *2 (N.D. Ohio Jan. 8, 2014)); LR 7.1. "District courts are afforded broad discretion in deciding whether to permit a party to file a sur-reply, the classic reason being '[w]hen new submissions and/or arguments are included in a reply brief, and a nonmovant's ability to respond to the new evidence has been vitiated.'" *Vaughn*, 2018 WL 2210873, at *2 (quoting *Key*, 551 F. App'x at 264). District Courts in the Sixth Circuit, however, generally require strict compliance with the

local rules, especially when the party is represented by a lawyer as opposed to being *pro se*. *Compare Warrinner, v. N. Am. Sec. Sol.*, 3:05-cv-244-s, 2008 WL 2355727, at *1 (W.D. Ky. June 5, 2008) (striking a sur-reply because Plaintiffs, represented by counsel, did not seek leave of court to file a sur-reply), *and Van Over v. DeWalt*, 06-cv-192-JMH, 2007 WL 956670, at *5 (E.D. Ky. Mar. 28, 2007) (striking sur-reply because the party did not seek leave of Court to file it even though the party was *pro se*), *with Edmonds v. Rees*, 3:06-cv-P301-H, 2008 WL 754727, at *1 (W.D. Ky. Mar. 19, 2008) (not striking sur-reply of a *pro se* plaintiff who reiterated previous arguments in the sur reply), *and King v. McCreary Cty. Jail*, 6:04-21-DCR, 2005 WL 1514304, at *4 (E.D. Ky. June 24, 2005) (not striking sur-reply of *pro se* litigant).

As Tarter is a party represented by counsel who did not seek leave of Court to file a sur-reply as required by local rule, the Motion to Strike shall be **granted.**

## IV.    ECOLAB'S MOTION FOR SUMMARY JUDGMENT[2]

### A.    Negligence Claim

To succeed on a common-law negligence claim in Kentucky, a plaintiff must prove four elements—(1) the defendant owed plaintiff a duty, (2) the defendant breached that duty, (3) the plaintiff was injured, and (4) the plaintiff's injury was caused by the defendant's breach of duty. *Wright v. House of Imports, Inc.*, 381 S.W.3d 209, 213 (Ky. 2012). To succeed on the fourth element, the plaintiff must show both factual and proximate causation. *Power & Tel. Supply Co., Inc. v. Suntrust Banks, Inc*, 447 F.3d 923, 932 (6th Cir. 2006). The underlying principles of a common-law cause of action for negligence are "foreseeability and reasonable care." *Ostendorf v. Clark Equip. Co.*, 122

---

[2]    See Parts II.B and II.C., *supra*, for a discussion of the standard of review and applicable law.

S.W.3d 530, 533 (Ky. 2003).

In Kentucky, the existence of duty is a matter of law for the court to decide because '[w]hen a court resolves a question of duty it is essentially making a policy determination." *Id.* (quoting *Mullins v. Commonwealth Life Ins. Co.*, 839 S.W.2d, 245, 248 (Ky. 1992)). "The court must determine whether 'upon the facts in evidence, such a relation exists between the parties that the community will impose a legal obligation upon one for the benefit of others—or, more simply, whether the interest of the plaintiff which has suffered invasion was entitled to legal protection at the hands of the defendant.'" *Power & Tele. Supply Co., Inc.*, 447 F.3d at 932 (quoting *Bradshaw v. Daniel*, 854 S.W.2d 865, 869 (Tenn. 1993)). The issue of breach, on the other hand, is a question of fact for a jury to decide. *Gordon v. Turner*, 2:13-cv-136, 2016 WL 3636073, at *4 (E.D. Ky. June 29, 2016). "So long as there is a genuine dispute as to a material fact concerning breach, such that a reasonable jury could find that the defendant was negligent, the Court is precluded from granting summary judgment." *Id.* The issue of injury is also a factual question for the jury, and the determination of causation is a mixed issue of law and fact. *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 89 (Ky. 2003).

### 1. Duty

The Court's inquiry must begin by determining whether Ecolab owed Tarter a duty. "If no duty is owed by the defendant to the plaintiff, there can be no breach thereof and therefore no actionable negligence." *Ashcraft v. People's Liberty Bank & Tr. Co.*, 724 S.W.2d 228, 229 (Ky. Ct. App. 1986). "Kentucky courts recognize a universal duty of care under which every person owes a duty to every other person to exercise ordinary care to prevent foreseeable injury." *Lee v. Farmer's Rural Elec. Co-op. Corp.*, 245 S.W.3d 209,

212 (Ky. Ct. App. 2007); *see also Carter v. Bullitt Host, LLC*, 471 S.W.3d 288, 297 (Ky. 2015); *Shelton*, 413 S.W.3d at 908. The foreseeability of the injury must be considered from the perspective of the defendant at the time the alleged negligence occurred and cannot be based on hindsight; the Court must consider "whether a reasonable person in a defendant's position would recognize undue risk to another." *Id.* at 212-213. Importantly, "[w]hether a harm was foreseeable in the context of determining duty depends on the general foreseeability of such harm, not whether the *specific mechanism* of the harm could be foreseen." *Id.* at 212 (emphasis added). A plaintiff does not have to prove that the "*exact manner* in which the injury occurred was foreseeable" in order to succeed in a negligence claim. *Isaacs v. Smith*, 5 S.W.3d 500, 502 (Ky. 1999) (emphasis added). Additionally, the risk of injury must be unreasonable in order for the defendant to be held liable. *Waldsachs v. Inland Marine Serv., Inc.*, 5:10-cv-5, 2011 WL 3813093, at *4 (W.D. Ky. Aug. 26, 2011) (citing *Pathways, Inc.*, 113 S.W.3d at 91).

"The Restatement, in its various iterations, has been central in the development of modern Kentucky tort law, and [the Kentucky Supreme Court] has repeatedly cited it with approval." *Shelton*, 413 S.W.3d at 911. In determining the foreseeability of risk, the Restatement (Second) of Torts guides the Court to consider a reasonable person's "attention, perception of the circumstances, memory, knowledge of other pertinent matters [including human qualities, habits and characteristics, and law and customs that affect people's conduct], intelligence and judgment as a reasonable man would have." Restatement (Second) of Torts § 289(a); *see also id.* at § 290. The Restatement (Second) of Torts specifically imposes liability upon "[o]ne who undertakes . . . to render services to another which he should recognize as necessary for the protection of a third person or

his things . . . if failure to exercise reasonable care increases the risk of [physical] harm [to the third person]." *Id.* at § 324A. Thus, in determining foreseeability, the level of knowledge and expertise of the defendant is taken into account. *Kelly v. Arrick's Bottled Gas Serv., Inc.*, 2:14-cv-118, 2016 WL 4925787, at *2 (E.D. Ky. Sept. 14, 2016).

The application of §§ 289(a) and 290 of the Restatement guided the Kentucky Supreme Court's finding of foreseeability in *Pathways, Inc. v. Hammons*. 113 S.W.3d at 90-91. Pathways is an agency that provides psychiatric and social services in Eastern Kentucky. *Id.* at 87. The plaintiff in that case, Ms. Hammons, suffered from mental-health issues and sought help from Pathways. *Id.* Specifically, the case arises out of Pathways's attempt to help Ms. Hammons find a place to live. *Id.* Pathways helped place her at Moore's Boarding Home, a boarding home that was "operating in violation of a court order that it cease operations" and was not registered with the Commonwealth [i.e. did not meet the Kentucky Cabinet for Health and Services health and safety standards]. *Id.* The plaintiff was assaulted at Moore's and filed suit against a number of defendants, including Pathways, seeking damages in connection with the assault. *Id.* at 88.

After completing the foreseeability analysis, the *Pathways* court found that Pathways did, in fact, owe a duty to the plaintiff. *Id.* at 91. In reaching this conclusion, the *Pathways* court focused on the fact that Pathways was aware that "boarding homes are regulated by the Commonwealth . . . [that the regulations] establish[] minimum health and safety standards for boarding homes and [the regulations were] enacted for the protection of 'boarders.'" *Id.* at 90. As Pathways knew of the regulations and their purpose, "it should have realized that placing Hammons [the plaintiff] at an unregistered boarding home created the risk that she would be in a physically unsafe and/or unsanitary

environment . . . [including] the specific risk that Hammons would suffer physical and/or mental abuse." *Id.* This awareness of the risks, alone, was not enough to create a duty; the *Pathways* court found, however, that there was a duty because it was "unreasonable for Pathways to fail to take the simple and readily available steps [of choosing a boarding home from the list of registered homes] that would have eliminated or greatly reduced that risk" given how great the risk was at an un-registered home. *Id.* at 91. To summarize, a duty was found because Pathways knew their actions created a great risk for the plaintiff and, unreasonably, took no steps to limit that risk. *Id.*

The Kentucky Supreme Court, in the later *Shelton* case, appeared to reconsider its approach to finding a duty in *Pathways*, noting that the inquiry was very fact intensive and it conflated the issue of duty with that of breach and causation. *Shelton*, 413 S.W.3d at 912 & n.40. The Court specifically noted that "a duty should not be expressed in such minute detail" and rather found that "Pathways [simply] had a duty of reasonable care [which was breached] by failing to use the current list of registered boarding homes." *Id.* at n.40. The Kentucky Supreme Court has described the *Shelton* holding as finding that factual considerations like obviousness of a hazard "were better addressed in deciding whether the defendant breached the almost universally accepted general duty of ordinary care owed by every person to all other persons." *Carter*, 471 S.W.3d at 297. The same court has also found that, while *Shelton* addressed the premises-liability issue of the obviousness of a hazard, "its rule is generally applicable to all negligence cases." *Id.* The *Carter* court summarized the impact of the *Shelton* approach—"[i]nstead of killing a case prematurely because of [a factual issue like obviousness or foreseeability], most non-frivolous cases will now be allowed to mature fully and go before a jury to determine

whether there has been tortious conduct at all." *Id.*

The provisions in the Restatement, as well as the application of the Restatement in the Commonwealth of Kentucky, and the apparent movement of the Kentucky Supreme Court to be more lenient in finding a duty owed require the Court to find that Ecolab owed a duty to Tarter. The Court recognizes that the Kentucky Court of Appeals has, more recently since *Carter*, questioned the extent to which *Shelton* applies to cases outside the premises-liability context. *See Howard v. Spradlin*, NO. 2017-CA-001478-MR, 2018 WL 5304188, at *3 (Ky. Ct. App. Oct. 2018). Thus, the Court will conduct the duty analysis under both the *Pathways* and *Shelton* approaches.

Under the foreseeability analysis laid out in *Pathways*, the actions of Ecolab created an unreasonable risk of a foreseeable injury. Like Pathways, Ecolab was aware of the health and safety regulations governing the operation of pools in Kentucky, and therefore, per the *Pathways* analysis, was aware of the risk to people coming in contact with a pool or spa that did not meet the state regulations. *Id.* at 90; (Docs. # 85-5 at 48:19-24, 88-10 at 74:11-76:9, 132:22-133:23 and 88-11 at 30:3-32:5, 36:10-39:1). Here, Ecolab not only recognized the health and safety risks but knew from the hundreds of pings and multiple site visits that the chemical levels in the pool, which help to prevent the growth of bacteria like *Legionella*, were often out of compliance with the state regulations and that the controller at the Embassy Suites was malfunctioning. *See, e.g.,* (Docs. # 88-3 at 1, 5, 7, 18, 88-4, 88-10 at 74:11-76:9, 88-10 132:22-133:23, 138:23-139:9, and 88-11 at 28:15-39:1). The Court finds that employees of Ecolab additionally, failed, unreasonably, to take "the simple and readily available steps" of personally reaching out to the management at the Embassy Suites (outside of routine service and

an extra service request) to attempt to help remedy the clear chemical imbalances; thus, the injury suffered by Tarter was foreseeable. *Pathways, Inc.* 113 S.W.3d at 91. Therefore, Ecolab owed a duty to Tarter under the *Pathways* approach.

*Shelton* and *Carter* suggest that the Kentucky Supreme Court, however, is moving toward a more expansive approach to duty and is leaving the fact-intensive inquiry for a jury to consider in determining breach. *Shelton*, 413 S.W.3d at 912 & n.40; *see also Howard*, 2018 WL 5304188, at *3 (discussing *Shelton*). Specifically, the Kentucky Supreme Court appears to be focusing its analysis on Kentucky's universal-duty rule. *Carter*, 471 S.W.3d at 297; *Lee*, 245 S.W.3d at 212; *see also Kendall v. Godbey*, 537 S.W.3d 326, 331-32 (Ky. Ct. App. 2017). Pursuant to this approach, the Court finds that Ecolab owed a duty of reasonable care to all who came in contact with the pool at the Embassy Suites, including Tarter; the more fact-intensive inquiries regarding the nature of Tarter's injury and the reasonableness of Ecolab's actions would be determined by a jury during its consideration of breach. *See Carter*, 471 S.W.3d at 297; *Shelton*, 413 S.W.3d at 912 & n.40. Therefore, under the *Shelton* and *Carter* approach, Ecolab also owed a duty to Tarter.

Ecolab argues that it had no duty because it "had no hand in ordering Plaintiff to clean the filter, and had no knowledge that the Health Department was investigating the hotel for the potential presence of Legionella" and therefore the injury was unforeseeable. (Doc. # 85-1 at 16). This argument is meritless under either the *Pathways* or *Shelton/Carter* approach. Ecolab's argument artificially narrows the scope of the foreseeability inquiry. The Kentucky Supreme Court has made clear that the "precise form of injury" does not have to be foreseeable—rather, "it is sufficient if the probability of

injury of some kind to persons within the natural range of the effect of the alleged negligent act could be foreseen." *Isaacs*, 5 S.W.3d at 502 (quoting *Miller v. Mills,* 257 S.W.2d 520, 522 (1953)). Here, Ecolab knew the risks associated with chemical imbalances in a pool and spa, *see* (Doc. # 88-11 at 30:0-32:5, 36:10-39:1) (Joel Flom, Customer Support Supervisor at Ecolab, testifying that the purpose of chlorine in a pool or spa is to kill bacteria and explaining how pH level impacts the effectiveness of chlorine); *see also, e.g.*, (Doc. # 88-10 at 74:11-76:9, 132:22-133:23) (Dennis Fitzpatrick, Ecolab employee, suggesting that Ecolab was aware of Kentucky pool regulations and noting that the pH level in a pool impacts bacteria growth), and therefore an injury caused by bacteria growth to anyone coming in contact with the pool is generally foreseeable. *See* Restatement (Second) of Torts § 289; *id.* at § 281 comment (b). Thus, Ecolab's argument that Tarter's injury was unforeseeable has no merit and does not change the Court's conclusion that Ecolab owed a duty to Tarter.

### 2. *Breach*

Genuine issues of material fact regarding breach require the Court to deny summary judgment on the negligence claim. Plaintiff has put forth evidence that Ecolab knew about the problems with the chemical levels in the pool and the controller, (Docs. # 88-3 at 1, 5, 7, 18 and 88-4, 88-10 at 138:23-139:9), was aware of the risks of lack of chemicals, (Docs. # 88-10 132:22-133:23 and 88-11 at 28:15-39:1), and was familiar with the Kentucky state regulations. (Doc. # 85-5 at 48:19-24, 88-10 at 74:11-76:9). Plaintiff also presented evidence that Ecolab branded itself as a company working to make pools cleaner and safer. *See* (Doc. # 88-3) (including the Ecolab motto: "Cleaner. Safer. Healthier."); (Doc. # 88-11 at 88:25) (Joel Flom, Customer Support Supervisor at Ecolab,

testifying that the customer support number for Ecolab is 1-800-35-CLEAN).  Viewing this evidence in the light most favorable to the Plaintiff, as required at the summary-judgment stage, the Court finds that a genuine issue of material fact exists as to whether Defendant Ecolab breached its duty toward Tarter.  *Shelton*, 413 S.W.3d at 905.  This evidence suggests more than "metaphysical doubt as to the material facts."  *Lossia*, 859 F.3d at 428 (quoting *Matshushita Elec. Indus. Co., Ltd.*, 475 U.S. at 586).  Accordingly, Ecolab's motion for summary judgment on Tarter's negligence claim must be **denied.**

### B.    Products-Liability Claim

"When a plaintiff 'fails to respond or to otherwise oppose a defendant's motion, then the district court may deem the plaintiff to have waived opposition to the motion.'" *Purefide v. Thompson*, 12-cv-66-GFVT, 2014 WL 4661955, at *2 (E.D. Ky. Sept. 18, 2014) (quoting *Scott v. Tennessee*, 878 F.2d 382, at *2 (6th Cir. 1989) (unpublished table decision)).  Tarter "fail[ed] to respond or to otherwise oppose" Ecolab's Motion for Summary Judgment on the products-liability claim and therefore waived opposition to that aspect of the Motion.  *See Scott*, 878 F.2d at *2; (Doc. # 88).  Accordingly, Ecolab's Motion for Summary Judgment is **granted** with respect to the products-liability claim.

## V.    CONCLUSION

For the reasons articulated herein, **IT IS HEREBY ORDERED** that:

(1)    AP/AIM's Motion for Summary Judgment (Doc. # 82) is **GRANTED**;

(2)    Ecolab's Motion for Summary Judgment (Doc. # 85) is **GRANTED IN PART AND DENIED IN PART**;

       (a)    The Motion is **DENIED** as to **Count II** (negligence);

       (b)    The Motion is **GRANTED** as to **Count III** (strict products liability);

(2)     Ecolab's Motion to Strike (Doc. # 97) is **GRANTED**;

(3)     The remaining parties to this action shall file a **Joint Notice** of available pre-trial and trial dates **within twenty (20) days of the date of entry of this Order**; and

(4)     Defendant Ecolab shall file a written response to Plaintiff's motion in limine (Doc. # 98) **not later than January 23, 2019**.

This 4th day of January, 2019.

Signed By:

*David L. Bunning*

United States District Judge